*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JOSHUA WAYNE CARR,

Defendant-Appellant.

UNPUBLISHED
December 21, 2023

No. 358663
Alpena Circuit Court
LC No. 21-009926-FH

Before: GLEICHER, C.J., and SWARTZLE and YATES, JJ.

PER CURIAM.

Defendant transported methamphetamine from Waterford, Michigan, to Alpena, Michigan, to sell it in the area. Following a jury trial, defendant was convicted of possession of methamphetamine with intent to deliver, MCL 333.7401(2)(b)(*i*); MCL 333.7214(c)(*ii*), and was sentenced as a fourth-offense habitual offender, MCL 769.12, to serve 6 to 20 years' imprisonment. Defendant appeals his conviction as of right and argues that the prosecutor intentionally misrepresented a witness's plea agreement, the trial court erred by admitting a judgment of sentence as evidence of his prior conviction under MRE 404(b), his trial counsel provided ineffective assistance on several grounds, and the trial court's imposition of court costs under MCL 769.1k(1)(b)(*iii*) should be vacated because MCL 769.1k(1)(b)(*iii*) is unconstitutional. Discerning no error warranting reversal, we affirm.

## I. BACKGROUND

On January 4, 2021, defendant, Nikolas Niezgoda, Erin Bissonette, Chad Kamen, and Mary DeCoster traveled together in DeCoster's van from Alpena to Waterford. Niezgoda testified that defendant had asked him to front the cost of the trip because he was unable to pay for the trip at that time, but defendant stated that he would pay him back with methamphetamine and money from selling methamphetamine that he obtained in Waterford. The group checked in at a hotel after they had arrived in Waterford. A man only known as "B" met the group in the lobby and gave defendant some money, who then gave the money to Niezgoda to pay for the room. The group then went upstairs to their room to get situated, and Niezgoda and Bissonette—Niezgoda's fiancé—helped DeCoster wash her laundry. When they returned to the room, defendant and

-1-

Kamen were using methamphetamine in the bathroom, and Niezgoda saw approximately four or five grams of methamphetamine on a scale. Defendant offered the methamphetamine to Bissonette, who took the methamphetamine and ran out of the room. Defendant and Kamen continued to use methamphetamine throughout the remainder of the day.

After checking out of the hotel the following afternoon, the group stopped at a Walmart in Waterford upon defendant's request so that he could pick up $500 that was sent to him as a wire transfer to a bank located inside of the store. DeCoster testified that she picked up the money for defendant because she was the only person who had an ID, and defendant immediately grabbed the money out of DeCoster's hands after she had collected it. The group subsequently returned to the hotel to drop defendant off. Niezgoda testified that defendant had decided to stay in Waterford while everybody else returned to Alpena because defendant intended to purchase more methamphetamine and return to Alpena the following day to sell it in the area. Defendant instructed Niezgoda to pick him and the additional methamphetamine up from Waterford the following day, but he stated that he would return to Alpena by bus if Niezgoda was unable to do so. Defendant then gave Niezgoda and Bissonette an additional seven grams of methamphetamine and instructed them to sell it for him while he was in Waterford, and he stated that he would sell the remaining methamphetamine upon his return the following day.

Niezgoda and Bissonette returned to Alpena on January 5, 2021, with approximately 12 or 13 grams of methamphetamine, and the two immediately began exchanging and selling the methamphetamine at a known drug house. Shortly after the two left the house in another person's car, Niezgoda was pulled over for driving without a license. Police officers searched Niezgoda and discovered approximately half of a gram of fentanyl in his pocket. The officers arrested Niezgoda and took him to the Michigan State Police (MSP) Post in Alpena, where Niezgoda was interviewed by Detective Brian McClelland of the MSP Huron Undercover Narcotics Team (HUNT). As a result of his arrest, Niezgoda was unable to pick defendant up in Waterford, and defendant was forced to return to Alpena by bus.

Shortly after DeCoster had dropped off Bissonette and Niezgoda, Trooper Justin Clark of the MSP pulled DeCoster over for a broken taillight and an improper plate. Trooper Clark testified that when he approached DeCoster's van, he noticed that Kamen was sitting in the backseat and making "furtive gestures." Trooper Clark became suspicious after seeing Kamen's behavior and after DeCoster had reported that the two were coming from a known drug house. Trooper Clark searched DeCoster's van and discovered methamphetamine and fentanyl in Kamen's coat pocket, and he subsequently arrested Kamen.

Based on information regarding defendant's alleged involvement in methamphetamine trafficking provided by Kamen and Niezgoda, the HUNT team obtained a search warrant for "cellular telephone pings" to use the real-time GPS location data of defendant's cell phone to locate defendant. The HUNT team determined that defendant was returning to Alpena on the evening of January 6, 2021, on an Indian Trails bus traveling on US-23 North. After setting up to conduct surveillance, several members of the HUNT team saw the bus pull into the Walmart parking lot, and Detective Joshua Henderson of the HUNT team reported that defendant had gotten off the bus and into a white Ford Escape. Trooper James Everidge of the MSP then stopped the Ford Escape before it left the parking lot, and he noticed defendant making "furtive" movements in the backseat of the car as he approached the car. Trooper Everidge immediately approached defendant in the

backseat while Detective McClelland and another officer approached the driver and the front passenger, and all three occupants were removed from the car and detained.

Detective Michael Oliver of the HUNT team testified that he searched defendant and discovered a small, black digital scale in defendant's left coat pocket, which had "a white substance" on it that the detective believed was methamphetamine. Members of the HUNT team also located two cell phones during a search of the Ford Escape, one of which was found on defendant's person and the other of which was found on the backseat of the car near where defendant had been sitting. Neither of the other occupants of the car indicated that the cell phones belonged to them. Detective Oliver testified that it was common for individuals trafficking drugs to carry more than one cell phone to keep from being located by law enforcement. While Detectives Trevor Bullock and McClelland of the HUNT team were standing near the Ford Escape, they noticed a plastic "corner-tie baggy" of crystallized methamphetamine on the floor where defendant had been sitting. Detective Bullock discovered additional methamphetamine inside of a children's book that was placed inside of the pouch on the back of the driver's seat as well as in the bottom of the pouch. In total, the HUNT team had recovered approximately 10 grams of methamphetamine. Defendant was subsequently arrested and charged with possession of methamphetamine with intent to deliver.

During pretrial, the prosecution filed notice of its intent to introduce evidence of other wrongful acts under MRE 404(b), to which defendant objected. The other-acts evidence that the prosecution planned to admit were defendant's prior criminal convictions from 2008, 2011, and 2018, for possession and delivery of various controlled substances as proof of defendant's intent to distribute the methamphetamine. After reviewing the parties' written submissions and hearing oral arguments, the trial court found that neither the 2008 nor the 2018 judgments of sentence were admissible under MRE 404(b), but it found that the 2011 judgment was admissible because defendant's 2011 conviction of delivery of a controlled substance was legally relevant to and probative of defendant's intent to deliver the methamphetamine when he possessed it and the prejudicial effect of the evidence did not substantially outweigh its probative value.

At the start of trial, defendant renewed his objection to the admission of the 2011 judgment of sentence under MRE 404(b) and argued, as he did previously, that the judgment was unduly prejudicial. Defendant also argued that the judgment violated his constitutional right to confront and cross-examine witnesses at trial. The trial court held that the judgment was admissible for the same reasons as it had previously stated, and it concluded that defendant's confrontation rights would not be violated because the information provided by the judgment was not testimonial in nature. At the conclusion of Trooper Clark's direct examination, the trial court admitted as evidence a redacted certified copy of the 2011 judgment of sentence. The judgment reflected that defendant had pleaded guilty to delivery of less than 50 grams of a controlled substance, but the judgment did not specify what controlled substance was involved. Trooper Clark stated that he was not familiar with the underlying facts of defendant's 2011 conviction.

Niezgoda, who testified at defendant's trial as part of a plea agreement, was the prosecution's principal witness at trial. The prosecutor stated at the start of her opening statement that Niezgoda was incarcerated in the county jail and that he "was given a deal of sorts in order to testify" against defendant. Niezgoda testified that he was incarcerated at the Alpena county jail because he "got caught with fentanyl" and had pleaded guilty to conspiracy to deliver fentanyl,

possession with intent to deliver fentanyl, and fourth-offense habitual offender. Niezgoda stated that he knew that his charges "carried up to life" but that, in terms of actual sentencing, his sentencing range was "anywhere between ten to 46 months." Niezgoda stated that the prosecution did not offer the plea agreement until approximately five months after his interview with Detective McClelland. In exchange for his testimony at defendant's trial, Niezgoda received a "cap" of "a year in the county jail from the day that [he] got sentenced" and the opportunity to attend a substance-abuse rehabilitation center during the last 60 days of his sentence. Niezgoda later clarified that he would ultimately serve 17 months in jail as a result of the plea deal because he "did five months 'dead time' " before he accepted the plea agreement.

Niezgoda explained to the jury what motivated him to accept the plea agreement. Niezgoda stated that it was "extremely important" to him "to stay in the county jail" and that remaining in the county jail "[a]bsolutely" was "a big consideration" for him. Niezgoda stated that there was nothing in "particular" about defendant that had motivated him to accept the plea agreement and that one of the biggest motivating factors for him was to tell the truth. Niezgoda also indicated that Bissonette and defendant had previously dated, but he did not "have any preconceived notions of" defendant "as a result of that dating relationship," stating, "[T]here is a small dislike there just because it's somebody's ex, you know, but it's not—nothing out of pure hate." When specifically asked whether Bissonette's past relationship with defendant was "part of his motivation to testify against" defendant, Niezgoda stated, "Absolutely not . . . . No."

Throughout trial, defense counsel largely focused on Niezgoda's credibility and motivation to testify against defendant. Niezgoda testified that he was "immediately forthcoming" with Detective McClelland during his interview and the detective did not offer him "any type of deal," but Niezgoda admitted on cross-examination that he had asked the detective within minutes of the interview, " 'What can I get if I tell you everything I know,' " because he had hoped to "be allowed to walk away." Detective McClelland testified that such questions at the beginning of an interview were "[e]xtremely typical," and he responded to Niezgoda that he was not going to give him any sort of deal. Detective McClelland stated on cross-examination that he did not "regret" using the information from Niezgoda in his search warrant because his statements proved to be "extremely accurate."

Defense counsel had also attempted to introduce the full audio recording of Niezgoda's interview with Detective McClelland, but the prosecutor would not stipulate to its admission, so defense counsel indicated that he would rely on cross-examination instead. During cross-examination, defense counsel highlighted all of Niezgoda's prior convictions over the past 10 years, which included seven second-degree home-invasion convictions, and Niezgoda admitted that he was required to testify at defendant's trial as part of his plea agreement. Defense counsel also repeatedly referred back to specific timestamps in the audio recording to emphasize inconsistencies between Niezgoda's testimony and his statements during his interview, and he offered to play the audio recording for Niezgoda to refresh his memory any time that the witness did not recall saying something that defense counsel had specifically cited to in the recording. Much of cross-examination consisted of Niezgoda stating that he did not "remember saying" what defense counsel had cited to or that defense counsel was "manipulating" what he said.

During closing argument, the prosecutor again addressed Niezgoda's plea agreement and his decision to testify at defendant's trial:

-4-

This particular person did speak up in hopes of getting himself out of a little bit of trouble, but that's who drug dealers talk to and who our witnesses have to be . . .

But let's look at just how much trouble . . . Niezgoda got himself out of. He got himself out of no trouble the night that he told the police officers what was happening. He was offered no deal or no help at that time and it wasn't until five months later as his own case progressed that he was offered any sort of deal from the [p]rosecution. He testified to you that his—his sentencing range would've been between 10 to 46 months, approximately, and he got 12. It's within the range. He also admitted he pled guilty to everything he was charged with so he got no deal on that end either and he fully admitted and—and like I said, we can't really pick our witnesses in these particular cases. But he has a criminal record, he's been to prison, and no one's hiding from that fact but these are the types of people that [defendant] is associating himself with as well . . .

After closing arguments, the trial court instructed the jurors that the prosecution must prove each element of a crime beyond a reasonable doubt; they could base their verdict only on properly admitted evidence; they could not use the evidence of defendant's 2011 conviction "for any other purpose aside from deciding . . . the issue of intent" and it was not evidence that he "committed the alleged crime in this case"; and the lawyers' questions, statements, arguments, and commentary were not evidence. The court also instructed the jurors on how to determine and weigh the credibility of witnesses and that they could only consider Niezgoda's plea agreement "as it relates to his credibility and how it may tend to show bias or self-interest."

Following a brief deliberation, the jury returned a guilty verdict. The trial court subsequently sentenced defendant as a fourth-offense habitual offender to 6 to 20 years' imprisonment and ordered him to pay $700 in court costs. In a postconviction motion, defendant moved for a new trial, an evidentiary hearing, and to correct his invalid sentence, on the grounds that: (1) the search warrant used to locate defendant was defective because it failed to establish a sufficient nexus between defendant's cell phone and the alleged criminal activity that the police sought to investigate; (2) defense counsel was ineffective for failing to move to suppress the evidence obtained as a result of the search warrant; (3) defense counsel was ineffective for failing to use the audio recording of Niezgoda's interview to highlight his motivations for testifying, to impeach him with prior inconsistent statements, and to refresh his recollection; (4) the prosecutor violated his due-process right to a fair trial by intentionally mischaracterizing the terms of Niezgoda's plea agreement; (5) defense counsel was ineffective for failing to object to the prosecutor's remarks; and (6) his court costs assessed under MCL 769.1k(1)(b)(*iii*) constituted an unconstitutional tax.

The trial court denied defendant's motion. The trial court found that defense counsel was not ineffective for failing to file a motion to suppress the evidence that resulted from the search warrant because the warrant "set forth sufficient facts and established a conspiracy for the [d]efendant to return to the Alpena area with illegal controlled substances." The trial court also found that the prosecutor did not misrepresent the terms of Niezgoda's plea agreement and that defense counsel was not ineffective for failing to object to the remarks. The trial court further found that defense counsel was not ineffective for failing to use the audio recording of Niezgoda's interview at trial because he had successfully impeached Niezgoda on cross-examination. The

constitutionality of a defendant's court costs was pending before the Michigan Supreme Court at the time of defendant's motion, so the trial court upheld "the prior finding until such time as the Supreme Court makes a finding to the contrary." This appeal followed.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises three claims of ineffective assistance on appeal. Claims of ineffective assistance of counsel present mixed questions of fact and law, and factual findings are reviewed for clear error, whereas questions of law are reviewed de novo. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). "The trial court's findings are clearly erroneous if this Court is definitely and firmly convinced that the trial court made a mistake." *People v Shaw*, 315 Mich App 668, 672; 892 NW2d 15 (2016). Because no evidentiary hearing was held in the trial court, our review is limited to errors apparent from the record. *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020).

"To establish ineffective assistance of counsel, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different." *Shaw*, 315 Mich App at 672. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018) (quotation marks and citation omitted). A defendant "making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). We presume counsel was effective, and defendant carries a heavy burden to overcome this presumption. *Head*, 323 Mich App at 539.

### 1. SEARCH WARRANT

Defendant first argues that his trial counsel provided ineffective assistance by failing to move to suppress the evidence obtained as a result of the search warrant because the affidavit for the search warrant failed to establish a sufficient nexus between the alleged criminal activity and defendant's cell phone. This issue is unpreserved because defendant did not challenge the search by moving to suppress the evidence recovered during the search or by objecting to the admission of the evidence, and we review unpreserved constitutional claims for plain error. See *People v Hughes*, 506 Mich 512, 522-523; 958 NW2d 98 (2020). The defendant bears the burden of persuasion and, to obtain appellate relief, must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999), reh den 461 Mich 1205 (1999). To satisfy the third element, the defendant must show that the error "affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Allen*, 507 Mich 597, 614; 968 NW2d 532 (2021) (quotation marks and citation omitted).

The United Stated Constitution and the Michigan Constitution protect individuals from unreasonable searches and seizures by the government. See US Const, Am IV; Const 1963, art 1, § 11. "[R]easonableness is always the touchstone of Fourth Amendment analysis," and while "a search warrant is not always required before searching or seizing a citizen's personal effects," "the general rule is that officers must obtain a warrant for a search to be reasonable under the Fourth Amendment." *Hughes*, 506 Mich at 524-525 (quotation marks and citations omitted). The Supreme Court of the United States has recently extended this general rule to cell-phone searches, holding "that officers must generally obtain a warrant before conducting a search of cell-phone data." *Id.*, citing *Riley v California*, 573 US 373, 386; 134 S Ct 2473; 189 L Ed 2d 430 (2014). As an aside, we note that, while it is well-established that general Fourth-Amendment principles apply to an officer's search of recorded cell-phone data, see *Riley*, 573 US at 386; *Hughes*, 506 Mich at 527, it is unclear whether those general principles extend to real-time location information obtained from an individual's cell phone, see *Carpenter v United States*, ___ US ___, ___; 138 S Ct 2206, 2217-2220; 201 L Ed 2d 5007 (2018) (emphasis added) (holding that "an individual maintains a legitimate expectation of privacy in the *record* of his physical movements as captured through" cell-phone location information (CSLI), but explicitly refusing to address whether general Fourth-Amendment principles extended to "real-time CSLI"). We need not resolve this unsettled area of law, however, because the police officers in this case obtained a search warrant prior to obtaining real-time location information of defendant's cell phone, and we can address the issue on appeal by analyzing the validity of the search warrant.

A search warrant may only be issued if probable cause exists to justify the search. US Const, Amend IV; Const 1963, art 1, § 11; MCL 780.651; *People v Franklin*, 500 Mich 92, 100; 894 NW2d 561 (2017). "Probable cause to issue a search warrant exists if there is a substantial basis for inferring a fair probability that evidence of a crime exists in the stated place." *People v Brown*, 297 Mich App 670, 675; 825 NW2d 91 (2012). "The warrant shall either state the grounds or the probable or reasonable cause for its issuance or shall have attached to it a copy of the affidavit." MCL 780.654(2). Additionally, the warrant "must state with particularity not only the items to be searched and seized, but also the alleged criminal activity justifying the warrant." *Hughes*, 506 Mich at 538. See also US Const Am IV; Const 1963, art 1, § 11; MCL 780.654(1). "That is, some context must be supplied by the affidavit and warrant that connects the particularized descriptions of the venue to be searched and the objects to be seized with the criminal behavior that is suspected, for even particularized descriptions will not always speak for themselves in evidencing criminality." *Hughes*, 506 Mich at 538.

"If the search warrant is supported by an affidavit, the affidavit must contain facts within the knowledge of the affiant and not mere conclusions or beliefs." *People v James*, 327 Mich App 79, 91; 932 NW2d 248 (2019) (quotation marks and citation omitted). While the affiant "may not draw his or her own inferences" based solely on his or her experience, "the affiant's experience is relevant to the establishment of probable cause." *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009). When there is a challenge to the search warrant, the affidavit in support of the search warrant must be read "in a common sense and realistic manner, not a crabbed or hypertechnical manner." *People v Mullen*, 282 Mich App 14, 27; 762 NW2d 170 (2008) (quotation marks and citations omitted). Accordingly, this Court looks to whether "a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause to issue a search warrant." *Waclawski*, 286 Mich App at 699. "A magistrate's finding of probable

cause and his or her decision to issue a search warrant should be given great deference and only disturbed in limited circumstances." *Franklin*, 500 Mich at 101.

The affidavit in this case was sufficient. The affidavit particularly described that "[t]he person, place, or thing to be searched" was located at "AT&T Wireless," and it particularly described "[t]he item to be searched for and seized" as "electronic global positioning or location information through 'pinging' the [listed] AT&T Wireless cell phone number" as it was required to do. See *Hughes*, 506 Mich at 538. The affidavit particularly described defendant's alleged criminal activity justifying the warrant and provided a substantial factual basis to support the inference that evidence of defendant's crime would be located at the GPS location provided by defendant's cell phone provider. See *Hughes*, 506 at 538; *Brown*, 297 Mich App at 675. Specifically, the affidavit provided that the listed phone number belonged to defendant; that defendant gave Niezgoda four grams of methamphetamine in exchange for a ride to Waterford; that defendant, DeCoster, Bissonette, Niezgoda, and Kamen travelled from Alpena to Waterford; that DeCoster picked up money for defendant from a bank in Walmart; that defendant gave others several grams of methamphetamine with instructions to return to Alpena on January 5, 2021, and sell it; and that defendant planned to return to Alpena on January 6, 2021, after he had obtained additional methamphetamine to sell in the area. The affidavit further indicated that Niezgoda and Kamen provided substantially similar information at separate times.

When reviewing Detective McClelland's search warrant in a "common sense and realistic manner," *Mullen*, 282 Mich App at 27, "a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause to issue a search warrant," *Waclawski*, 286 Mich App at 699. To investigate whether defendant was trafficking methamphetamine from one city to another, the police necessarily needed to determine defendant's real-time location, and obtaining such information from defendant's cell phone was a reasonable means of doing so. See *Hughes*, 506 Mich at 524-525. Based on the facts provided in the affidavit, it was probable that real-time location information from defendant's cell phone would provide evidence of defendant's actual location at the time that he was actively transporting methamphetamine from Waterford to Alpena for sale. The affidavit was not exclusively based on Detective McClelland's training and experience and contained more than his "mere conclusions or beliefs." See *James*, 327 Mich App at 91; see also *Waclawski*, 286 Mich App at 698. This Court gives great deference to a probable-cause finding, and defendant has provided no basis upon which to disturb that finding. See *Franklin*, 500 Mich at 101.

Given that the search warrant was valid, defendant's argument that his trial counsel was ineffective for failing to move to suppress the evidence obtained as a result of the search warrant necessarily fails. Defense counsel's objection to the validity of the search warrant or the evidence obtained as a result would have been futile, and counsel is not considered constitutionally ineffective for failing to raise a futile or meritless objection. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

2. PROSECUTORIAL MISCONDUCT

Defendant next argues that he was denied a fair trial because the prosecutor intentionally mischaracterized the terms of Niezgoda's plea agreement and that his trial counsel provided ineffective assistance by failing to object. Because defendant did not object to the prosecutor's

remarks and request a curative instruction at trial, we review this unpreserved claim for plain error affecting substantial rights. See *People v Bennett*, 290 Mich App 465, 475-476; 802 NW2d 627 (2010).

"The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). Claims of prosecutorial misconduct are reviewed "on a case-by-case basis by examining the record and evaluating the remarks in context." *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010) (quotation marks and citation omitted). Prosecutors are generally "accorded great latitude regarding their arguments and conduct." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995) (quotation marks and citation omitted). A prosecutor may reference "a plea agreement containing a promise of truthfulness" so long as the agreement is not used "to suggest that the government had some special knowledge, not known to the jury, that the witness was testifying truthfully." *Id*. at 276 (quotation marks and citation omitted).

When reviewing the prosecutor's remarks in context, the remarks were not improper. See *Mann*, 288 Mich App at 119. Niezgoda described to what he had pleaded guilty and what would be his minimum sentencing-guidelines range, and he stated that, in exchange for pleading guilty and testifying at defendant's trial, he would serve one year in the county jail. The prosecutor's references to the terms of Niezgoda's agreement, his sentencing-guidelines range, and his actual sentence accurately reflected Niezgoda's testimony. Moreover, both Niezgoda *and* Detective McClelland testified that the detective did not offer any sort of deal or consideration in exchange for Niezgoda's information at the time of the interview and that Niezgoda did not receive any sort of benefit until he accepted a plea offer from the prosecution five months later. Prosecutors are afforded great latitude with their arguments, and nothing in the record suggests that the prosecutor drew any unreasonable inferences from or made impermissible commentary on the presented evidence and denied defendant a fair trial. See *Bahoda*, 448 Mich at 266-267, 282, 284-285. The prosecutor's remarks "did not convey a message to the jury that [s]he had some special knowledge" regarding Niezgoda's truthfulness, see *id*. at 277, and we therefore cannot conclude that the prosecutor committed any error. Given this, defendant's ineffective-assistance claim regarding his trial counsel's failure to object to the remarks necessarily fails because any objection would have been futile. See *Ericksen*, 288 Mich App at 201.

### 3. NIEZGODA'S TESTIMONY

For his third and final ineffective-assistance claim, defendant argues that his trial counsel rendered ineffective assistance by failing to use the audio recording to impeach Niezgoda, undermine his credibility, and refresh his memory. Defendant's arguments are without merit. While defense counsel was permitted to admit the audio recording of Niezgoda's interview as "[e]xtrinsic evidence of a prior inconsistent statement" under MRE 613 to impeach Niezgoda's testimony and undermine his credibility as a witness or under MRE 612 to refresh Niezgoda's recollection, he was not *required* to do so. Defense counsel's decisions "regarding what evidence to present," "how to question witnesses," and "what evidence to highlight during closing argument" are matters of trial strategy, *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008), and this Court does not second-guess counsel on matters of trial strategy, *People v Traver (On Remand)*, 328 Mich App 418, 422-423; 937 NW2d 398 (2019). Defendant has failed to show

that defense counsel's decision not to introduce the audio recording fell short of acceptable trial strategy.

Moreover, contrary to defendant's assertions on appeal, the record clearly reflects that defense counsel did, in fact, attempt to introduce the audio recording as evidence, but he ultimately chose to cross-examine Niezgoda after the prosecution would not stipulate to its admission. Defense counsel then proceeded to cross-examine Niezgoda about his plea agreement and motivation to testify at defendant's trial, and he did so quite thoroughly. Niezgoda made a multitude of detrimental admissions during cross-examination, and his unsavory character was made quite clear by defense counsel's line of questioning. Defense counsel repeatedly referred back to specific timestamps in the recording to emphasize inconsistencies between Niezgoda's testimony and his interview statements, and he offered to play the recording for Niezgoda to refresh his memory whenever Niezgoda stated that he could not remember saying something during the interview. While defendant may well believe that presenting the audio recording of Niezgoda's interview would have been helpful, "that counsel could conceivably have done more, or that a particular trial strategy failed, does not mean counsel's performance was deficient." *People v Blevins*, 314 Mich App 339, 351; 886 NW2d 456 (2016). Defendant has not demonstrated that defense counsel's decision to cross-examine Niezgoda, rather than present the jury with the audio recording of his interview, fell below an objective standard of reasonableness. See *Shaw*, 315 Mich App at 672.

## B. OTHER-ACTS EVIDENCE

Defendant next argues that the trial court abused its discretion by admitting the 2011 judgment of sentence because it was inadmissible other-acts evidence under MRE 404(b) and that the admission of the judgment violated his constitutional right to confront witnesses at trial. Defendant objected to the admission of the 2011 judgment of sentence on both MRE 404(b) and Confrontation Clause grounds, so we review this preserved evidentiary issue for an abuse of discretion. See *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019); see also MRE 103(a)(1). "The decision to admit evidence is within the trial court's discretion and will not be disturbed unless that decision falls outside the range of principled outcomes." *Thorpe*, 504 Mich at 251-252 (quotation marks and citation omitted). "Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo." *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013). We review preserved constitutional issues de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018).

### 1. MRE 404(B)

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith" but it may be admitted as "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." MRE 404(b)(1). To admit evidence under MRE 404(b)(1), the offering party must show: (1) it is offered for a proper purpose; (2) it is relevant; and (3) its probative value is not substantially outweighed by the danger of unfair prejudice. *People v VanderVliet*, 444 Mich 52, 74; 508 NW2d 114 (1993), amended 445 Mich 1205 (1994).

We must first determine whether the evidence was offered for a proper purpose. *Id*. To show that a proper purpose exists, the offering party "must explain how and demonstrate that the other-acts evidence is logically relevant to the stated purpose without relying on an impermissible propensity inference." *People v Galloway*, 335 Mich App 629, 638; 967 NW2d 629 (2020). The prosecutor in this case argued that the 2011 judgment of sentence reflecting defendant's conviction for delivery of a controlled substance was offered to show defendant's intent to deliver the methamphetamine. Intent is listed as a proper purpose, see MRE 404(b)(1), and it has been well-accepted as one by our Courts, see *VanderVliet*, 444 Mich at 79-80; *People v Hoffman*, 225 Mich App 103, 106; 570 NW2d 146 (1997). Moreover, "[w]hen other acts are offered to show intent, logical relevance dictates only that the charged crime and the proffered other acts 'are of the same general category.' " *VanderVliet*, 444 Mich at 79-80 (citation omitted). It goes without saying that delivery of a controlled substance and possession of a controlled substance with intent to deliver " 'are of the same general category.' " *Id*. (citation omitted). Given this, it is clear that defendant's 2011 conviction for delivery of a controlled substance, as evidenced by the judgment of sentence, is logically relevant to the offered purpose of intent, and was therefore offered for a proper purpose. See *id*.; *Galloway*, 335 Mich App at 638.

Second, we review whether the offered evidence was legally relevant. *VanderVliet*, 444 Mich at 74. Evidence is legally relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Defendant pleaded not guilty to the charged offense in this case, and "all elements of a criminal offense are 'in issue' when a defendant enters a plea of not guilty," *People v Crawford*, 458 Mich 376, 389; 582 NW2d 785 (1998) (citation omitted). The prosecution was therefore obligated to prove that defendant knowingly possessed the methamphetamine with the specific intent of distributing it, see *id*., and "[e]vidence of intent is relevant because it negates the reasonable assumption that the incident was an accident," *People v McGhee*, 268 Mich App 600, 611; 709 NW2d 595 (2005). Accordingly, defendant's intent was squarely " 'in issue,' " and evidence that defendant had previously delivered a controlled substance is relevant because it helps show that defendant intended to deliver the methamphetamine when he possessed it. See *Crawford*, 458 Mich at 389-390; *McGhee*, 368 Mich App at 611.

Lastly, we review whether the probative value of the evidence was substantially outweighed by the danger of unfair prejudice under MRE 403. *VanderVliet*, 444 Mich at 74. Unfair prejudice means "an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." *People v Uribe*, 310 Mich App 467, 481; 872 NW2d 511 (2015), vacated on other grounds 499 Mich 921 (2016) (quotation marks and citation omitted). The trial court has discretion to determine whether the probative value of the evidence is substantially outweighed by the risk of unfair prejudice. *Galloway*, 335 Mich App at 646.

In this case, the trial court examined the admissibility of three judgments of sentence offered as other-acts evidence by the prosecution, and, after thorough analyses, it found that only the 2011 judgment conviction was admissible under MRE 404(b). The trial court found that defendant's 2011 conviction was probative of defendant's intent to deliver the methamphetamine because the charged offense and the 2011 conviction were "clearly of the 'same general category,' " and it found that the probative value of the conviction was not substantially outweighed by any unfair prejudice because defendant had pleaded guilty to the delivery charge in 2011 and there was "nothing to suggest that the evidence [would] be given undue or preemptive weight by the jury."

-11-

Despite its findings, the trial court also indicated that it would provide a limiting instruction to the jury for the other-acts evidence to "mitigate any risk of unfair prejudice," and the trial court ultimately did, in fact, provide that limiting instruction. Determining whether the probative value of the specific acts was substantially outweighed by the risk of unfair prejudice is "a close evidentiary question," *Thorpe*, 504 Mich at 251, and, while a judgment of sentence alone may not be adequate in every instance that it is offered as other-acts evidence, the trial court in this case did not abuse its discretion by admitting the 2011 judgment of sentence.

## 2. CONFRONTATION CLAUSE

Defendant further asserts that he was denied his constitutional right to confront and cross-examine witnesses by the trial court's admission of the 2011 judgment of sentence. An individual accused of a crime has the constitutional right to confront witnesses in court, subject to cross-examination. US Const, Am VI; Const 1963, art 1, § 20. With that said, testimonial statements offered for their truth trigger the protections of the Confrontation Clause. *Williams v Illinois*, 567 US 50, 57-58; 132 S Ct 2221; 183 L Ed 2d 89 (2012). A statement is testimonial if its primary purpose "is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006). The introduction of public records is generally not considered to violate the Confrontation Clause because, as the records were "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial," the records are nontestimonial. *Melendez-Diaz v Massachusetts*, 557 US 305, 324; 129 S Ct 2527; 174 L Ed 2d 314 (2009); see also *People v Nunley*, 491 Mich 686, 706; 821 NW2d 642 (2012), cert den 568 US 1029; 133 S Ct 667; 184 L Ed 2d 463 (2012) (holding that a certificate of mailing from the Michigan Department of State is a "nontestimonial business record created primarily for an administrative reason").

Defendant's argument that he was denied the right to confront and cross-examine witnesses is without merit. Like the certificate in *Nunley*, 491 Mich at 706, the 2011 judgment was made well before the charged offenses occurred in this case. Additionally, any record of defendant's 2011 conviction was created for an administrative purpose, not for the purpose of proving a fact in this case. See *id.*; *Melendez-Diaz*, 557 US at 324. Though defendant's 2011 conviction was offered as substantive evidence to prove his intent to deliver the methamphetamine, the judgment cannot be considered testimonial in nature because it was not made for that purpose. Accordingly, the 2011 judgment was not barred by the Confrontation Clause, and defendant was not denied his confrontation rights. See *Melendez-Diaz*, 557 US at 324; *Nunley*, 491 Mich at 706.

## C. ASSESSMENT OF COURT COSTS

Finally, defendant argues that the trial court's imposition of court costs under MCL 769.1k(1)(b)(*iii*) amounted to an unconstitutional tax. Similar claims have been rejected by this Court. This Court concluded in *People v Cameron*, 319 Mich App 215, 229-236; 900 NW2d 658 (2017), that the trial court's assessment of court costs under MCL 769.1k(1)(b)(*iii*) against a convicted defendant constitutes a tax rather than a fee because it serves a revenue-raising purpose, but it held that the tax was constitutional. In *People v Johnson*, 336 Mich App 688; 971 NW2d 692 (2021), this Court again concluded that MCL 769.1k(1)(b)(*iii*) is constitutional. Defendant raises the same due-process and separation-of-powers arguments here as raised by the defendant

in *Johnson*, 336 Mich App at 692-693, and he asserts that this Court wrongly decided the issues in that case.

On July 22, 2022, our Supreme Court granted Johnson's application for leave to appeal and ordered the parties to address the due-process and separation-of-powers issues. *People v Johnson*, 509 Mich 1094; 976 NW2d 862 (2022). The Court subsequently issued an order on July 7, 2023, however, in which it vacated its July 22, 2022 order and denied the application for leave to appeal because it was "no longer persuaded that the questions presented should be reviewed by this Court." *People v Johnson*, ___ Mich ___; 992 NW2d 247 (2023). Given the Supreme Court's recent order, defendant's arguments fail. This Court's holding in *Johnson*, 336 Mich App 688, is controlling law on the issues, and this Court is bound by that decision. See MCR 7.215(C)(2); MCR 7.215(J)(1).

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Brock A. Swartzle
/s/ Christopher P. Yates